COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Powell and Senior Judge Coleman
Argued at Richmond, Virginia


CEDRIC F. CLARKE, S/K/A
  CEDRIC FRANCOIS CLARKE
                                                   MEMORANDUM OPINION[*] BY
v.        Record No. 0930-08-2                     JUDGE SAM W. COLEMAN III
                                                        MAY 26, 2009
COMMONWEALTH OF VIRGINIA


             FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                        Walter W. Stout, III, Judge

        Jessica M. Bulos, Assistant Appellate Defender, for appellant.

        Virginia B. Theisen, Senior Assistant Attorney General (Robert F.
        McDonnell, Attorney General, on brief), for appellee.


        In a jury trial, Cedric F. Clarke (appellant) was convicted of robbery, carjacking, and two

counts of using a firearm in the commission of a felony.  On appeal, appellant contends the trial

court erred:  1) in refusing to strike for cause a potential juror who had impaired vision; 2) in

denying appellant's challenge, pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), to the

Commonwealth's exercise of a peremptory strike of an African-American juror; 3) in granting the

Commonwealth's motion to disallow appellant's exercise of two peremptory strikes; 4) in denying

his motion to strike the robbery charge on sufficiency grounds; 5) in denying his motion to suppress

the out-of-court identification evidence; and 6) in refusing to declare a mistrial based upon alleged

communication during trial between two witnesses for the Commonwealth.  Finding no error, we

affirm appellant's convictions.

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

FACTS

Under familiar principles of appellate review, we examine the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. See Haskins v. Commonwealth, 31 Va. App. 145, 149-50, 521 S.E.2d 777, 779 (1999).

In May 2007, Matthew Braxton, who bred and sold dogs, placed an advertisement in a newspaper offering pit bull puppies for sale. On May 31, 2007, Braxton received a telephone call from a man who expressed interest in purchasing pit bull puppies. The man did not tell Braxton his name, but he called Braxton five or six times that day. They discussed how many dogs the man wanted to purchase and arranged a meeting. The man and Braxton agreed to meet after 7:00 p.m. that night at the man's home. The man gave Braxton an address on Antrim Street in Richmond.

With his friend Joe Barnes, Braxton drove to Antrim Street that night. They traveled in a white van with "J. L. Jennings Electrical" painted on the side. In the back of the van, they carried a male adult dog and eight puppies, secured in cages.

Braxton searched for the address on Antrim Street the man had provided, but the address did not exist. Although it was dark, the area was illuminated by streetlights. When he reached a dead end, Braxton executed a U-turn to return to Broad Street. Braxton then received a telephone call from the man. The man instructed Braxton to drive down Antrim Street again and said he would be waiting in the middle of the street. The man said he was wearing all black clothing and his hair was in an Afro style. Braxton followed the man's direction and saw a person in the street who fit the description. Braxton unequivocally identified that man at trial as appellant.

Braxton parked the van, got out, and greeted appellant. They walked to the rear of the van where Braxton opened the rear doors to show the dogs to appellant. When Braxton started to retrieve a puppy from the cage, he heard appellant say either "watch out" or "you better get back." As Braxton turned to face appellant, Braxton saw a gun in appellant's hand. Braxton jumped back and held up his hands. Appellant ordered Braxton to tell "his buddy" to exit the van, which Braxton did.

Braxton heard Barnes moving about inside the van, which apparently distracted appellant momentarily. As Braxton moved from the rear of the van to beside the front passenger door, Barnes jumped out the window of the van and fled. Appellant said "he better run," and began shooting.

As appellant was firing at Barnes, Braxton reached into the van, grabbed his firearm, and sought cover behind a tree. When Braxton attempted to shoot at appellant, his gun jammed, so he fled across the street where he tried to fix the jammed gun.

When Braxton returned to the street appellant was driving away in the van with the rear doors open. After making a U-turn, appellant stopped, exited the vehicle, tried to close the rear doors, then drove away again. Braxton, on foot, chased the van and called 911. Braxton provided a description of appellant to the police. Once he lost sight of the van, Braxton returned to Antrim Street where he met the police.

Steven Hughes, who lived at the corner of Cutshaw Avenue and Antrim Street, looked out his window after hearing gunshots that night. Hughes saw a man dressed in dark clothing, with an Afro hairstyle, shooting a gun. Hughes saw the man get into the driver's seat of a van, make a U-turn, then drive away. Hughes also saw a second man in foot pursuit of the van. Hughes witnessed the events from a distance of about seventy feet, and he had a clear, unobstructed view. Hughes called 911 and provided a description of the van.

- 3 -

Officer Danny Rhodenizer was on bicycle patrol in the area when he received a radio call about the incident at about 8:58 p.m. He observed a van matching the description of the stolen vehicle, followed it, and requested backup assistance. Rhodenizer did not lose sight of the vehicle before officers in a marked police vehicle stopped the van. Rhodenizer saw officers place appellant in custody at 9:07 p.m., which was almost three minutes after Rhodenizer began following the van. During Rhodenizer's pursuit of the van, the vehicle did not stop and no one entered or exited it. Rhodenizer identified appellant, who had an Afro hairstyle and was wearing all black clothing, as the driver and sole occupant of the van. The police found a revolver on the floorboard of the van between the front seats.

Separately, the police transported Braxton and Hughes to where appellant had been apprehended. Each of them identified appellant as the assailant. Braxton identified appellant as his assailant within fifteen minutes of the incident, and Hughes identified appellant within thirty-five minutes of having observed the incident.

Appellant, who had prior felony convictions, testified and denied any involvement in the robbery and carjacking. Appellant claimed a drug dealer named "Rob" was driving the van and stopped and asked him to drive the van for him. Appellant denied being near Antrim Street that night or handling a gun. Appellant admitted that after his arrest he commented, "Man, I was hurting tonight. I needed to get some money."

I.

During *voir dire*, the potential jurors were asked if they or family members had been crime victims. Juror Fitzgerald indicated that recently he had been the victim of an assault and attempted robbery. Fitzgerald stated the police had apprehended his assailant, but the matter was not prosecuted because he is "legally blind" and could not identify the suspect in a lineup. Fitzgerald said he was employed at a bar at the time the attack occurred.

- 4 -

In the courtroom, Fitzgerald indicated he could see defense counsel, but not clearly. Fitzgerald also said he was unable to read street names on a map displayed by counsel. The trial judge denied appellant's motion to strike Fitzgerald for cause, stating the juror was able to see although legally blind.[1] The trial judge further stated that if Fitzgerald was chosen to serve as a juror, the court would make accommodations for Fitzgerald's eyesight limitation.

Appellant contends that, because he was contesting the witnesses' identification of him as the perpetrator and there were trial exhibits requiring close visual inspection, the trial court erred in refusing to strike Fitzgerald for cause since he was legally blind.

> A defendant in a criminal prosecution has a fundamental right to a trial by an impartial jury. U.S. Const. amends. VI and XIV; Va. Const. art. I, § 8; Gray v. Commonwealth, 226 Va. 591, 592-93, 311 S.E.2d 409, 409-10 (1984). The right of an impartial jury requires that the jury be capable of understanding the factual issues that it must resolve. See Commonwealth v. Susi, 477 N.E.2d 995, 997 (Mass. 1985); State v. Hurd, 480 S.E.2d 94, 97 (S.C. Ct. App. 1996). Indeed, the United States Supreme Court has stated that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982).

Mason v. Commonwealth, 255 Va. 505, 509, 498 S.E.2d 921, 923 (1998) (defendant was not denied his right to a fair trial where it was discovered, after the penalty phase of trial, that a juror had limited understanding of the English language).

> On appellate review, this Court must give deference to the circuit court's determination whether to exclude a prospective juror because that court was able to see and hear each member of the venire respond to questions posed. The circuit court is in a superior position to determine whether a prospective juror's responses during *voir dire* indicate that the juror would be prevented from or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath.

Green v. Commonwealth, 262 Va. 105, 115, 546 S.E.2d 446, 451 (2001).

---

[1] Appellant used a peremptory strike to remove Fitzgerald from the jury.

Code § 8.01-337 provides that "[n]o person shall be deemed incompetent to serve on any jury because of blindness or partial blindness." The record reveals Fitzgerald was not blind, but his vision was impaired. To require a juror be excused from service due to disability, the impairment must be "such as to probably cause injustice in a criminal case to the Commonwealth or to the accused." Code § 8.01-352(B).

Although no Virginia appellate court has considered this precise issue, at least one other jurisdiction has found no due process violation where a visually impaired person was permitted to serve as a juror in a criminal trial. See State v. Caldwell, 603 N.Y.S.2d 713, 714 (N.Y. Crim. Ct. 1993). The Caldwell court noted that in appropriate circumstances reasonable modifications in the trial procedure, such as moving the juror closer to the witness box or providing the juror with a description of evidence as it was introduced, could be made to accommodate a visually impaired juror and permit her to fulfill her function. Id. at 714-15. The determinative issue is "whether the court could accommodate the juror by verbally describing the evidence or by any other means, and whether the evidence is so crucial that the juror's inability to see it denied the defendant a fair trial." Id. at 716. But see Susi, 477 N.E.2d at 998 (trial court erred in refusing to excuse for cause a blind juror where identification was the predominant issue and jurors were asked to compare demonstrative evidence and physical appearances).

While Fitzgerald did have a significant visual impairment, he was not without sight. His impairment was not obvious to those in the courtroom, as it went unnoticed until Fitzgerald responded to questioning about whether he had been the victim of a crime. Fitzgerald revealed that despite the condition of his eyesight he had been employed at the time of his recent attack. The trial court had the opportunity to see and hear Fitzgerald and assess his ability to serve as a juror. Fitzgerald could not see clearly, but the trial court stated it intended to make accommodations to permit Fitzgerald to function as a part of the jury. We cannot say that, based

- 6 -

upon the facts and circumstances, the trial court abused its discretion in denying appellant's motion to strike Fitzgerald for cause.

II.

The jury pool included ten African-American females, eight Caucasian males, and two Caucasian females. Initially, the Commonwealth used its peremptory strikes to remove four African-American women from the jury. The prosecutor explained she struck Paulette Jefferson because Jefferson's child had an extensive criminal record. The prosecutor explained she struck the other three African-Americans because during *voir dire* they had spent considerable time looking "sympathetically" at appellant and his family. In response, defense counsel asserted that looking at appellant "sympathetically" was not a justifiable reason for striking the three African-Americans from the jury. The trial court denied appellant's Batson challenge regarding the Commonwealth's strike of Jefferson, but disallowed the Commonwealth's strikes of the other three African-American jurors.

On appeal, appellant contends the trial court erred in denying his Batson challenge with regard to Jefferson. After a criminal defendant raises a Batson challenge to the prosecutor's exercise of a peremptory strike,

> the burden shifts to the prosecutor to articulate a racially neutral explanation for striking the jurors in question. Batson, 476 U.S. at 96-97. If the court determines that the proffered reasons are race-neutral, the defendant should be afforded an opportunity to show why the reasons, even though facially race-neutral, are merely pretextual and that the challenged strikes were based on race. United States v. Joe, 928 F.2d 99, 103 (4th Cir. 1991). But, ultimately, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Batson, 476 U.S. at 98. On appeal, the trial court's findings will

not be reversed unless they are clearly erroneous.[2]  Hernandez v. New York, 500 U.S. 352, [369] (1991).

James v. Commonwealth, 247 Va. 459, 461-62, 442 S.E.2d 396, 398 (1994) (footnote added).

> The trial court has a pivotal role in evaluating Batson claims.  Step three of the Batson inquiry involves an evaluation of the prosecutor's credibility, see 476 U.S. at 98, n.21, and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge," Hernandez, 500 U.S. at 365.  In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance.  In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.  We have recognized that these questions of credibility and demeanor lie "peculiarly within a trial judge's province," ibid. (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985), and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court]." 500 U.S. at 366.

Snyder v. Louisiana, 128 S. Ct. 1203, 1208 (2008).

The prosecutor's rationale for the peremptory strike of Jefferson related to her having a child who has an extensive criminal record.  Thus, taken as true, the prosecutor's explanation indicates the peremptory strike was not based on the intention to exclude an African-American from the jury panel, but rather on the intention to exclude a potential juror whose impartiality may have been tainted by her family connection.  Thus, the prosecutor's explanation was not discriminatory, and the trial court did not err by accepting the race-neutral reason.

Moreover, appellant failed to meet his burden of proving purposeful discrimination.  After the prosecutor stated her reason for striking Jefferson, appellant did not argue or attempt to show the prosecutor's explanation was merely a pretext for a racially motivated strike.  Having

---

[2] "In Virginia, questions of fact are binding on appeal unless 'plainly wrong.'" McGee v. Commonwealth, 25 Va. App. 193, 198 n.1, 487 S.E.2d 259, 261 n.1 (1997) (en banc) (citations omitted).

been provided no basis to conclude otherwise, the trial court found the prosecutor's explanation for striking Jefferson was not pretextual. Because we cannot say this finding was plainly wrong, we do not disturb the trial court's ruling.[3]

### III.

When questioned by the trial court regarding her exercise of peremptory strikes of Caucasian jurors, defense counsel said she struck jurors Herzog and Schanberger "because of their jobs" and they were "not the appropriate class." Defense counsel claimed Herzog would be unsympathetic to appellant due to Herzog's employment in business management, as well as his relative wealth. Defense counsel further stated she struck Schanberger because of his employment experience in the legal field. Defense counsel said she struck Edwards because he is a teacher. Counsel further stated: "I think teachers tend to be very hard on people of my client's background. I also thought the way he was dressed, to me, seemed to be very formal, almost military-like." The trial court found the reasons for striking Herzog and Edwards were pretextual, and disallowed the strikes. Appellant challenges this ruling on appeal.

The same procedure involved in a <u>Batson</u> challenge to the Commonwealth's exercise of peremptory strikes is used to determine

> whether a defendant unlawfully exercised a peremptory strike to remove a juror on the basis of race. The Commonwealth first must make a *prima facie* showing that the strike was made on the basis of race. The burden then shifts to the defendant to articulate racially-neutral explanations for striking the juror in question. If the court determines that the proffered reasons are race-neutral, the Commonwealth should be afforded an opportunity to show why the reasons, although race-neutral, are merely pretextual and

---

[3] On appeal, appellant argues that the prosecutor's basis for removing Jefferson was based upon conjecture and speculation because no evidence obtained during *voir dire* suggested Jefferson had a child who had been convicted of a criminal offense. However, appellant's "failure to raise [that] argument[] before the trial court precludes him from raising [it] for the first time on appeal." <u>Buck v. Commonwealth</u>, 247 Va. 449, 452-53, 443 S.E.2d 414, 416 (1994); Rule 5A:18. Had appellant raised the argument at trial the court could have inquired as to the basis for knowing or believing that Jefferson's child had a criminal record.

racially based. Ultimately, the trial court must determine whether the Commonwealth has carried its burden of establishing purposeful discrimination.

Cudjoe v. Commonwealth, 23 Va. App. 193, 198, 475 S.E.2d 821, 823 (1996).

In reviewing the trial court's rulings on the peremptory jury strikes, we note that

[t]he trial judge presided at the proceedings, personally observed the entire jury panel, the challenged jurors and the composition of the trial jury, entertained the assurances and arguments of the prosecutor and was familiar with the case. Obvious human characteristics such as age, sex, race and demeanor are generally discernible and apparent to anyone present in the courtroom, including the trial judge, defendant and his counsel. Though not precisely recited in the record, such facts and circumstances attendant to jury selection presented an array of sensory perceptions to the trial judge which were relevant and appropriate considerations to a disposition of [the Commonwealth's Batson] motion.

Barksdale v. Commonwealth, 17 Va. App. 456, 461, 438 S.E.2d 761, 764 (1993) (*en banc*).

Based upon its observations, the trial court concluded the alleged explanations for two of appellant's three strikes of Caucasian jurors were pretextual. The record provides no reason to conclude the trial court abused its discretion in reaching its decision. Thus, we defer to the trial court's determination of pretext in appellant's stated rationale for striking Herzog and Edwards, and affirm the trial court's decision to grant the Commonwealth's Batson motion as to those jurors.

IV.

Challenging the sufficiency of the evidence to sustain his conviction of robbery, appellant contends the evidence supported the reasonable hypothesis that the perpetrator intended to steal only the van and obtained the dogs simply because they were within the vehicle. Thus, he argues, the taking of the dogs did not constitute a "separate and distinct act, apart from the seizure of the automobile[,]" and was not "accompanied by a separate threat of violence." Brown v. Commonwealth, 37 Va. App. 507, 517-18, 559 S.E.2d 415, 420 (2002).

- 10 -

Carjacking is defined as:

> the intentional seizure or seizure of control of a motor vehicle of another with intent to permanently or temporarily deprive another in possession or control of the vehicle of that possession or control by means of partial strangulation, or suffocation, or by striking or beating, or by other violence to the person, or by assault or otherwise putting a person in fear of serious bodily harm, or by the threat or presenting of firearms, or other deadly weapon or instrumentality whatsoever.

Code § 18.2-58.1(B).

The carjacking statute specifically provides, "The provisions of this section shall not preclude the applicability of any other provision of the criminal law of the Commonwealth which may apply to any course of conduct which violates this section." Code § 18.2-58.1(C). By enacting this language, "the General Assembly made it clear that conviction for the offense of carjacking does not prohibit the Commonwealth from pursuing any other crime an offender commits while the carjacking is in progress." Brown, 37 Va. App. at 518, 559 S.E.2d at 420-21.

> "A conviction for robbery requires proof beyond a reasonable doubt that the defendant . . . took property from the victim by force, threats, or violence, and that the intent to steal co-existed with the act of force." Pugliese v. Commonwealth, 16 Va. App. 82, 92, 428 S.E.2d 16, 24 (1993). . . . "[T]he carjacking provision is . . . confined by the same limitations which apply to robbery. Thus, the requisite violence or intimidation must precede or be concomitant with the taking." Bell v. Commonwealth, 21 Va. App. 693, 701, 467 S.E.2d 289, 293 (1996).

> "Intent in fact is the purpose formed in a person's mind, which may be shown by the circumstances surrounding the offense, including the person's conduct and his statements." Nobles v. Commonwealth, 218 Va. 548, 551, 238 S.E.2d 808, 810 (1977). "Intent may, and often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts are within the province of the trier of fact." Fleming v. Commonwealth, 13 Va. App. 349, 353, 412 S.E.2d 180, 183 (1991).

Abraham v. Commonwealth, 32 Va. App. 22, 27, 526 S.E.2d 277, 279 (2000).

- 11 -

The evidence proved appellant lured Braxton to the Antrim Street location under the pretense of purchasing pit bull puppies from him. Once Braxton arrived, appellant confirmed the presence of the dogs by looking into the rear of the van, and appellant asked Braxton to remove a dog from its cage. At that point, appellant brandished the firearm and told Braxton to move back. Only after Braxton had submitted to appellant's threat and backed away from the dogs did appellant issue further orders that Barnes should exit the van. Once Barnes was out of the van, appellant fired his weapon as Barnes fled the scene, thus permitting appellant to complete the carjacking and the theft of the pit bull puppies underlying the robbery conviction.

Considering these facts and circumstances, the evidence proved appellant made a separate and distinct threat of violence to accomplish the taking of the van after he had made clear his intent to steal the dogs from Braxton. Thus, the evidence proved appellant possessed the intent to steal both the dogs and the van and that he used separate threats of violence to accomplish both robbery and carjacking. Accordingly, the trial court did not err in denying appellant's motion to strike the robbery charge.

V.

Appellant contends the trial court erred in denying his motion to suppress the identification testimony of Braxton and Hughes. "'The burden is upon [the defendant] to show that th[e] ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error.'" McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (*en banc*) (quoting Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)).

"An out-of-court identification is admissible if either (1) the identification was not unduly suggestive; or (2) the procedure was unduly suggestive, but the identification was so reliable that there is no substantial likelihood of misidentification." Charity v. Commonwealth, 24 Va. App.

258, 261, 482 S.E.2d 59, 60 (1998). The factors for determining the reliability of identification testimony include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

Assuming *arguendo* that the out-of-court identification procedure was unduly suggestive in this case, the application of the factors in Biggers demonstrates the reliability of Braxton's identification of appellant. In a location illuminated by streetlights, Braxton stood within a few feet of appellant and conversed with him about the dogs. Braxton prepared to show the dogs to appellant. Braxton continued to observe appellant after he pulled out a gun and threatened both Barnes and him. Braxton saw appellant get in the van and drive away, although he stopped briefly to close the rear doors of the vehicle. The police apprehended appellant just minutes after the report of the incident to the police. Braxton identified appellant within fifteen minutes of the robbery. Appellant's appearance was consistent with the description Braxton provided of an African-American man with bushy hair and dark clothing.

Similarly, the facts and circumstances underscore the reliability of Hughes' identification of appellant. Unlike Braxton, Hughes viewed the incident from the relative safety of his home and not as a victim of the offenses. From a distance of about seventy feet, Hughes observed a man shooting a gun near the van. Hughes then saw the man get into the van and drive off, with another man in foot pursuit. From the time Hughes observed the robbery/carjacking until he identified the suspect, only about thirty-five minutes had elapsed. Hughes was certain that the man he identified after the crimes was the same man he had seen shooting a gun and driving

away in the van on Antrim Street. Other than having described the suspect as wearing shorts, the description Hughes gave the police matched appellant's appearance on the night of his arrest.

The record thus supports the trial court's denial of appellant's motion to suppress the identification testimony, and we do not disturb this decision.

VI.

Appellant contends the trial court erred in refusing to grant his request for a mistrial. After the parties exercised their peremptory strikes, defense counsel stated to the trial court that Braxton and a police officer were in the hallway outside the courtroom "discussing the description of the defendant." Once the trial court had ruled upon the Batson challenges, defense counsel advised the trial court that her investigator had overheard a conversation in the hallway between Braxton and "the bald officer" regarding appellant's physical description. The prosecutor clarified that the officer involved would have been Officer Barkley, but that he had no pertinent information he could have provided Braxton. Appellant moved for a mistrial, but the trial court denied the motion. The trial court then called all the witnesses into the courtroom and instructed them not to discuss the case during trial with anyone but counsel.

On cross-examination, Braxton and Hughes each denied having a conversation with the other during the trial about the identification of appellant. Appellant called as a witness Shenita Stinson, an investigator for the public defender's office. Stinson testified she overheard Braxton and Hughes talking outside the courtroom during the trial. Stinson said Hughes mentioned his initial description of appellant, and told Braxton "not to change his story." Appellant did not move for a mistrial based upon Braxton's and Hughes' alleged communication.

Appellant argues on appeal that the trial court should have granted a mistrial based upon Braxton's and Hughes' alleged communication during the trial. However, when appellant made his motion for a mistrial, he contended Braxton had communicated with a police officer, not

- 14 -

Hughes. Appellant did not argue in a motion for mistrial that conversation between Braxton and Hughes, two fact witnesses, caused him prejudice requiring a new trial.

Rule 5A:18 requires that objections to a trial court's action or ruling be made with specificity in order to preserve an issue for appeal. See Nelson v. Commonwealth, 50 Va. App. 413, 420-21, 650 S.E.2d 562, 566 (2007). A trial court must be alerted to the precise issue to which a party objects. See Neal v. Commonwealth, 15 Va. App. 416, 422-23, 425 S.E.2d 521, 525 (1992). Because the requirements of Rule 5A:18 have not been met, we will not consider this question on appeal. Nor do we address this issue pursuant to the good cause or ends of justice exceptions to Rule 5A:18.

> Although Rule 5A:18 allows exceptions for good cause or to meet the ends of justice, appellant does not argue that we should invoke these exceptions. See e.g., Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) ("In order to avail oneself of the exception, a *defendant must affirmatively show* that a miscarriage of justice has occurred, not that a miscarriage might have occurred." (emphasis added)). We will not consider, *sua sponte*, a "miscarriage of justice" argument under Rule 5A:18.

Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (en banc).

## CONCLUSION

For the foregoing reasons, we affirm appellant's convictions.

Affirmed.